Case number 23-3692 Keith Siefert v. City of Liberty Township OH or arguments not to exceed, 15 minutes per side, Ms. Christian Marie Krause for the appellant. Good afternoon, Your Honors. My name is Christian Krause and I represent the appellant Keith Siefert. I would like to reserve three minutes for my rebuttal. Mr. Siefert was an 11-year employee of Liberty Township. He had no history of prior discipline and he was terminated less than 48 hours after suffering a mental breakdown at work. Both at the time of his termination and for months thereafter, Mr. Siefert was never told of why he had been terminated. He learned of the alleged reasons months later when he filed for unemployment benefits. Mr. Siefert then filed a lawsuit alleging FMLA interference and disability discrimination. The Township then moved for summary judgment and the District Court granted the defendant's motion. Anderson v. Liberty Lobbity Inc., which is a Supreme Court decision, the central decision when it comes to analyzing motions for summary judgment, indicates the central issue is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. This was the lens through which the District Court was required to analyze this particular case. With respect to the FMLA interference claim, this claim is analyzed under the McDonald-Douglas burden shifting analysis. First, it is incumbent upon Mr. Siefert to establish a prima facie case of FMLA interference. In the motions for summary judgment, the Township actually succeeded the first four elements of the FMLA interference prima facie case. It was only the fifth element, whether the employer denied the FMLA benefits to which he was entitled, that was in fact in dispute. But we believe this is actually what the District Court got right. The District Court determined that Mr. Siefert did in fact meet the prima facie standard for establishing a case of FMLA interference. And for that, I would draw your attention... Was the FMLA benefit that he was entitled to? I thought that was the fifth part, right? The fifth element is that the employer denied him FMLA benefits to which he was entitled. I'm asking you, what was the FMLA benefit that he was entitled to? He was entitled to a leave of absence for treatment of a serious medical condition. In this particular case, the acute psychosis that he had been diagnosed with. After he was taken away by ambulance from the Township on July 14th. He was entitled to that regardless of his other actions? Well, that's the point that I was trying to make. I think that if you look at this Court's decision in Provenzano v. LCI Holdings, it's particularly important to pay attention to this quote. The prima facie evaluation must be conducted independently of the defendant's nondiscriminatory reason and must not conflate the prima facie and pretext stages. And I think that's really what the Township was arguing when it argued that Mr. Siefert did not make the prima facie case of FMLA interference. It was conflating the subsequent elements of the McDonnell Douglas test with regard to both the reasons they argued for the termination and our response that those reasons were pretextual in nature. The District Court in their motion, even though they granted the motion for summary judgment, they did find that Mr. Siefert had in fact established a prima facie case of FMLA interference. At that point, the Township argued that Mr. Siefert was terminated for three reasons. His failure to complete an assignment on time, damage done to a police car, and internet usage which was deemed to be excessive. After establishing the legitimate nondiscriminatory reason, the burden then shifted back to Mr. Siefert and at that point it was up to him to prove that those reasons were pretext for unlawful discrimination. Now this Court's decision in Blair v. Henry Filters I think is particularly important because in this decision, this Court held that to establish pretext, a plaintiff must only rebut the defendant's proffered rationale, not disprove it. And this is where I think the Court made its most significant error. In its Memorandum of Opinion and Order, the District Court held, overall, plaintiff fails to prove that the defendant's reasons for his termination were pretextual. We weren't required to prove anything. Under this Court's decision in Blair, we were required to produce evidence to rebut the three nondiscriminatory reasons that were alleged by the Township. But it must be evidence and reasons that a reasonable juror could accept. I grant you the District Court used the word prove, but I don't read it as really relying on that. I read Judge Pearson as indicating that the evidence submitted would not persuade a reasonable juror. Well, I think you have to look at the three different tests under pretext. Only one of which we are required to establish. So the first test to establish pretext was that the reasons offered by the Township had no basis in fact. Now, under that first test, that test looks at the employer's investigation and their disciplinary decision process. Does it do that if there's not really any particular doubt in the sense that he worked on the wrong car, he didn't finish the thing on time, and he was watching Classmates.com? I mean, you don't really dispute that on the facts, do you? No. I think the evidence is clear that he did work on the wrong car. I mean, I think that the reasons why he worked on the wrong car are relevant. I think that he worked on the wrong car because the proper car wasn't at the Township at the time. But usually, has no basis in fact means, you know, I didn't really work on the wrong car, I didn't really watch the internet, and so on. That's correct. I agree that that can be one way to establish the first test under pretext. But as the Court noted in Smith v. Chrysler, courts should not blindly assume that the employer's description is honest. And here we know that there wasn't an investigation conducted. No witness statements were taken. No one even spoke to Mr. Seifert about what he did or why he did it. 48 hours after he was taken away by ambulance while he was still in the hospital. Is there anything that says that you have to do that? I mean, look, suppose he shot somebody, and you saw him shoot him. And you say, I'm firing you because you shot somebody. You don't have to investigate why he shot them. I understand, Your Honor. Under certain circumstances, the conduct could be so egregious that termination would be warranted. But I don't think that those are the circumstances here. One thing that I think is significant is one of the reasons that they relied on upon terminating him was his Internet usage. Yet his own supervisor, Martha Weirich, who was the township administrator, she testified in her deposition that his Internet usage wasn't even looked at until after he was terminated. And with regard to the damage to the... Wouldn't you be arguing then that these various things did not actually motivate the firing? Well, I mean, and again, therein lies the second test, right? And so, you know, which is you could establish pretext by showing that the proffered reason did not motivate the discharge, and that attacks the credibility of the employer's explanation. So, yes, I think that, you know, what they relied upon here, some of those things are also relevant in looking at the second test under pretext. This particular test looks at, or can look at, you know, suspicious timing. And here, the timing we would submit is extremely suspicious, given that the termination occurred just 48 hours after he was taken away from the hospital. But here's a couple other points that go to that second test for pretext as to whether or not what they said actually motivated their decision to terminate. When Captain Buchala came to Mrs. Siefert's house on the evening of July 14, 2020, he didn't mention anything about computer usage, although he testified that he had already looked at Mr. Siefert's computer. He didn't mention anything about him not feeling to compete the project. There must have been some discussion with regard to the fact that Mr. Siefert worked on the wrong vehicle because Mrs. Siefert offered her insurance, and Captain Buchala said that won't be necessary. But Buchala is not a township trustee, right? Did you depose any of the actual decision makers? Yes, sir. We deposed two of the three township trustees, along with Mr. Siefert's supervisor, Martha Wyrick. And as I indicated, Mrs. Wyrick knew very little about the project he was assigned, the car that he worked on that he should not have worked on, the cost of the repairs, his time on the Internet, again, although she indicated that he worked on the Internet after, or they looked at his Internet usage after the termination had already taken place. And both, with respect to this particular test for pretext, both Molero, who was the chief of police who delivered the termination notice, and his supervisor, Martha Wyrick, both of those individuals in the days following the termination told Mrs. Siefert that Mr. Siefert had been terminated because the township thought he was unsafe. You said you deposed the supervisors themselves. I really didn't see much in your brief about that. I mean, you had Buhala's statement about, well, maybe somebody else would have given them a different result. So then I was kind of looking for, oh, what did the supervisors say? And I guess they didn't give you good answers. They didn't give me almost any answers. If you look at the testimony of Martha Wyrick, who was Mr. Siefert's supervisor at the time, she essentially could not recall anything. She couldn't recall any of the circumstances. She's not the supervisor. She is. Sorry, we may be using the wrong word. The township trustees are the people who made the decision, weren't they? The township trustees made the decision. So you deposed them. Yes. And I think you said yes. Yes. I deposed two of the three township trustees. I may have misused the word supervisor. A lot of counties call them that. I apologize. Martha Wyrick was, in fact, the supervisor. She was deposed. She recalled very little about the circumstances surrounding the termination. In addition to that, we also deposed Clebone and Sisbar, two of the three township trustees, who, again, could recall very little with regard to the profit reasons surrounding Mr. Siefert's termination. I'd like to ask a question about the interaction of these claims. Yes. That is correct. But if they terminated him for a just reason that had nothing whatever to do with FMLA, and there's not a genuine issue of fact on that issue, where does that leave us? Well, I mean, I don't think that the FMLA interference claim, I mean, I would agree, this is not a strict liability claim. So you could have circumstances where the reason for termination was sufficient and that they didn't have to offer him FMLA leave. But I don't think that's the facts of this particular case. Remember that the testimony here was that on the afternoon of July 14th, when that project was supposed to be completed, they knew, both Buhala and Davis testified, that they were aware that that project was not going to be done by the end of the day on July 14th, and that one of the reasons it wasn't going to be done was because Davis, who was the IT specialist, observed Mr. Seifert sitting on his computer looking at classmates.com. He, in turn, went to Buhala, called him and gave him this information, and Buhala did nothing in terms of taking disciplinary action. I would submit that those reasons supported, those were two of the three reasons that they ultimately terminated Mr. Seifert. And if those reasons were, in fact, so egregious to warrant termination, why wasn't he terminated on the afternoon of July 14th before he had the breakdown? He wasn't terminated until after he had the breakdown and was lying in the psychiatric ward of the hospital. What is the remedy for the FMLA claim? I'm not sure I understand the question. If you prevail on the FMLA claim, what relief are you requesting? Well, I mean, the damages that are available on an FMLA claim would be that any sort of economic loss he suffered as a result of the termination, and that you can ask the court for liquidated damages and attorney's fees. I mean, here, they didn't give him his time off, and so thus, we believe that that opens up his claim for economic damages. So would it be for the time that he was entitled to take FMLA leave? It would be for any economic damages he suffered that stemmed from the decision to terminate. In this particular case, he was off of work. This happened during the pandemic. I don't believe he found other employment until, I think, October of 2022. So it's not limited to the time that he would be entitled to take FMLA leave? It is not limited simply to the 12 weeks, no. Thank you. Thank you. May it please the Court, Mr. Krauss. My name is Greg Beck, and I'm here on behalf of Liberty Township. Where I disagree with my colleague is that the District Court somehow got this issue wrong. The facts in the case are very clear, and I was happy to hear that the District Court really doesn't challenge these underlying facts. Mr. Seaford was an employee at will. He wasn't protected by a CBA. He wasn't in a classified position, and so, of course, he's terminable at will. The Township, through Captain Buchala, had given him specific job requirements, and these were very specific. And they were very important. They were actually installing this watchguard program into their cruisers, and this was not only a security measure, but it also automated many things. It made things very easy. For instance, when the car would drive into the bay, the software would download everything that was recorded within the cruiser itself, the cam, the dispatch, and everything. And so it was a really nice tool. And the reason that this was important was that they were flying folks in from Texas to not only train the officers on how to use it, but to make sure that the software was installed properly. And so, as we know from the facts, and I think the facts in this are very critical because I think the law on this issue is very clear as well. The appellant knew he had two weeks to finish this, and during this whole period of time, he never complained to anyone. Captain Buchala's job through the police department was to communicate with him. He was not his supervisor. Well, let's take the claims that he's making, the first one being the FMLA interference claim. The district court found that there was a prima facie case. You give the three reasons why you terminated him two days after he has the mental breakdown, while he's in the hospital. And now your opponent at the district court in here is challenging, under the man's-earth three-part test, on showing pretext. Why isn't there enough here to get to a jury on whether the three reasons that you assert actually motivated, as opposed to other reasons, i.e., wanting to interfere with FMLA rights? The argument would have to be that the motivation was to simply deny him from not taking his leave. But this case, and the reason I was spending a little energy on the facts, Your Honor, was that everything that happened that really led to his termination, except for the damage to the vehicle, occurred long before anyone even knew about this issue with respect to a serious medical condition. I mean, he had weeks, and he didn't get the job done. He admits it. He was cruising on the Internet, and I have copies of those things. I mean, literally hours. He has evidence that he's presented in the summary judgment record that other people were on the Internet and were not terminated. He has evidence that other people damaged police cars by crashing them into things at their own fault, whereas his damage to the police car was de minimis, a couple hundred dollars by drilling a hole in the wrong police car. So why isn't he producing enough evidence to get to a jury? Because, as we argued with the district court, the distinction between a police officer wrecking a cruiser negligently or accidentally is different than a situation where he is doing a job and literally using the wrong vehicle and drilling into the wrong roof. I recall, and tell me when I'm wrong, that there was evidence that this was something that was easily fixed, that it was just going to cost a couple hundred dollars to repair the hole in the roof or wherever the hole was. I think that's true. The drilling was not expensive. And that his wife offered to pay for it. But this all occurred during the same period of time when he was supposed to be working on other vehicles. And that's the big problem. These vehicles were not in service. The vehicle that he damaged was taken out of service. I mean, these are not, and this is not a large township. These vehicles need to be put into service and to be worked upon. That was also part of the issue. The issue was that these vehicles needed to get out into the field with their officers and prohibited from doing it. What evidence should we look at to decide whether these three reasons actually motivated his termination or were sufficient to warrant his termination? Well, again, first, as the District Court found, Mr. Seifert knew what the project was. He had two weeks to do it. He never complained. He has never told anyone he needed equipment. He didn't have access to the vehicles. And, in fact, during that period of time when he should have been working on these cars, he is spending literally hours on the Internet. And yes, it's true that people use the Internet from time to time, as probably everyone does, but no one that the township was aware of had been using it for hours and hours during the same period of time he was required to do these particular jobs. And that's what made it significant. And they don't really dispute that. And the first time that the township learns of any issue with respect to a medical condition is on July 14th. Before that time, in the weeks and even the months that had occurred before, there was never an issue. There is no connection between this request for leave or the serious medical condition and these other issues. If, for instance, there was medical evidence that said that his cruising on the Internet or his failure to do this work was because his cognition was compromised and so forth, that might be something that they could argue. But there is no connection between his medical condition, where he would have been entitled to FMLA had he asked for it, versus what really happened. And, in fact, their medical records are attached to Mr. Buhala's deposition. And, you know, he was diagnosed with delusion, with no etiology, but his MOCA score, which is the Montreal Cognitive Assessment, basically was normal. So he had a normal cognitive function, but for some reason on that day he had some delusional issue that I think is what their claim is, what caused him to drill into the wrong vehicle. But if we look at what the township analyzes under the Honest Belief Rule, it basically looked at all of these issues and said, we have an employee who was tasked to do something very important and he failed to do it. And he damaged property that he shouldn't have done. What should we do with the statements that he was terminated because he was viewed as being unsafe? That issue arises out of the unfortunate situation in our country where gun violence is a dangerous thing. Mr. Seifer was a gun person and it was discussed. And some of the sites he was looking at on these internets were gun sites, and he doesn't dispute that either. The township was concerned what his reaction might be when he was terminated. He wasn't terminated because he was unsafe. So your position is that the unsafeness was what would he do after he was terminated? What would he do if he came to work? Because he was released on July 17th. Let's say he came to work the following week and then he was told he was terminated. They were concerned about what his reaction might be. But I thought he was terminated while he was in the hospital. He was. He was. I'm just suggesting to you that the reason that they talked to him in the hospital is they wanted to tell him in that setting. Unsafety couldn't be the reason for his termination then. And it was not. That's true. It was not. Why terminate him now rather than a week later? Wasn't that the theory you just stated? Well, sure, because they wanted to let him, to tell him while he, because they also had a policy that they always implemented, which is that anybody that they terminate, they basically keep them from the premises. And so they wanted him to have all that information. And I understand how the optics on this work, but that was their intention. Their idea was not to, they didn't terminate him, and that wasn't a reason that they did it, but they advised him because they were concerned about the situation. And when we say what they hear, I mostly read from the briefs things that these other people, Buhala and so on, in the depositions of the supervised, the township trustees, sorry, get the title right, themselves, did they articulate any of these things or were they asked about any of these things? They were. And my colleague is correct that some of their memory wasn't the greatest about what happened. How long after the events was the deposition? A year or two? At least. This happened in 2020. The depositions, I think, were in 2022 or 2020. But they tried to recall, but basically they had the information that we've articulated, that he knew about the time frame, he failed to do the job, he damaged the vehicle, and he had been on the Internet an extraordinarily long period of time. And that impacted and was a factor in why he didn't get the job done in the first place. And I believe that because those are fair reasons for why he was terminated and it would be enough to motivate a reasonable employer if they had an employee who was given a very, very specific important task and they knew about it, who then failed to complete it, failed to do it when we were bringing people in from out of state, and then they found out that one of the reasons was because he was spending an inordinate amount of time on the Internet. And then on top of that, created some other damage. I mean, when we look at all of those issues together, I think that that are the facts that we should look at to show that not only did this was their true and honest belief, but those are the things that motivated the termination and not some other fact that they didn't want him to be on leave somehow or that they were trying to interfere with his FMLA rights. And we haven't talked much about the disability issue, but I don't even think he had a qualifying disability. I don't think there's any real fact in this. What was it, in your opinion, that made it not a qualifying disability? Well, it was only short term. And it's not clear whether it even affected a normal life function that he had. But it was a short term duration. I mean, he was out of the hospital three days. He was released back to work on July 29th. So this is the kind of medical situation that your position would be is not suitable for a disability discrimination claim, but rather would be a situation where someone would seek and obtain FMLA leave. I do agree with that, Your Honor. I think this is exactly what, and that is the distinction between the two. As you know, it's the serious medical condition versus a qualifying disability. So I do think FMLA would apply in this situation, but I don't believe there's any real evidence that we interfered with that. And that certainly wasn't the township's intent and their efforts. Are there cases that address whether someone should be able to be terminated while in the hospital for a condition that qualifies for FMLA leave? Well, the Yarberry case was one we cited in our brief, which is almost identical on point. In this circuit, Mr. Yarberry had a very similar situation, except his was an acute manic episode in which he went into, he worked for Gregg Appliance, and he went into the facility at like midnight and violated every policy you could imagine. He used the computers. He used equipment. And he did all kinds of things, sent out a slew of things. And then he went to the hospital at his fiancee's insistence, and it was determined that he had, in fact, a manic episode. And he had none of this before in the past. He was terminated while he was still under medical care within days after the event. And this Court found in that particular case that even though, again, it was a close call, and optically it didn't look great, the truth was is that he clearly had violated policy. And that warranted his termination. And so because this is not strict liability and because of the events that happened pre- Was Yarberry an FMLA case or was it an employment discrimination case? I think it was. It was a discrimination case. So that doesn't answer my question then. Is there a case that you would point to that would say that under the FMLA, someone can be denied FMLA rights to leave and terminated on it when someone is during the period that one would be taking the FMLA leave? I don't have that. I guess I thought maybe I'm conflating it with Yarborough, but there were statements that if your misconduct justifies termination, the fact that the misconduct is also caused by a qualifying condition doesn't excuse your being subject to termination for the misconduct. Correct. I mean, again, it's the extreme case, but the person shoots somebody or even he was on. He was on FMLA leave and he comes into the workplace and shoots somebody. And you would normally say you'd think you could terminate him even if he's on FMLA leave. Well, and I do think that you can discipline an employee who engages in pre-medical condition conduct even if they've begun their FMLA, and that's what this case essentially stands for. I mean, there is no dispute that the conduct that he engaged in that resulted in his termination occurred before the serious medical condition was even acknowledged or known. And the idea that just because I... The decision to terminate him, though, was made subsequent to the manifestation of the condition. It was, Judge Givens, you're correct. But I believe that under the case law, if that conduct occurs pre-serious medical condition, that employee is not insulated by FMLA from termination because if he would have been terminated anyway had he not exercised those rights under the FMLA, and I think that's what this case also demonstrates, those rights were not interfered with, and that's the position we have. I see my time is up. Thank you. Thank you. Just very briefly, a few points I'd like to hit on rebuttal. One thing I failed to mention before is that we have deposition testimony from the IT specialist, Mr. Davis, who indicated that on July 10th, which was the Friday before the project was set to be due, Mr. Seifert was given equipment that was necessary for the installation of the WatchGuard components. Also on July 13th, the day before the project was to be completed, Mr. Seifert was given more equipment that was necessary for the completion of the WatchGuard product. So I do take exception to counsel's statements that the reason that the WatchGuard product wasn't installed on time was solely because of some perceived excessive Internet usage on Mr. Seifert. Was there any statement as to when that material should have been given? Did he say, oh, my gosh, I can't do that now because I haven't had this for a while? If I'm managing a project or working on a project, I would know if the reason I can't do it is because you haven't given me the stuff. I mean, I read that, but I didn't see such a complaint made. Did I miss that? I'm not sure whether or not he made a complaint about it changes the analysis. I mean, the question is whether or not he should have been terminated for failure to complete the project on time. And here what I'm saying is part of the reason the project wasn't completed on time was that he was being given equipment at the last minute. Well, I mean, we don't know that unless you have some evidence of it. I mean, things are staged. Again, I'm not saying that might not be true, but if I'm managing a project, I do things, and things come to me at the appropriate time, and I get it done. So again, I'm not saying it might not be true, but I don't see any evidence. For example, you might have said, well, we went to the watchguard company and they said, of course you get this equipment six days ahead, not three days ahead. But there's none of that in the record, is there? There's no indication in the records that it was Mr. Seifert's responsibility to order the equipment or make sure it was there at a certain time. There was no evidence in the record that any of the deliveries were not on time. You just said they happened to be on this date. Well, the project had to be completed by July 14th, and things that he needed for the project were not given to him until the day before. So he was being given equipment at the last minute, which impacted his ability to complete the project on time. Likewise, the last car that he needed wasn't present on the afternoon of July 14th. These are all things that, again, in the framework of whether or not a summary judgment should have been granted, the analysis is, is the evidence so one-sided that you could only find in favor of one party? And I believe it is not. Just a very quick conclusion, because I didn't touch on it before. The district court also held that he didn't meet the standard or the definition of disability. And if you look at the ADA Amendments Act of 2008, it is clear that when it comes to defining disability, disability is to be broadly construed in favor of coverage, and an impairment that is episodic or in remission is a disability that would substantially limit a major life activity. And I would ask you to take a look at the three cases that are cited by defense counsel, two of the three, in arguing that there is no disability pre-date the ADA Amendments Act, and the third, there was no dispute that the individual did, in fact, have a disability. So we believe that he also... What was the major life activity? The major life activity was his ability to work. His thinking was impacted. He had cognitive difficulty that was impaired as a result of the acute psych... The doctor said that he could return to work in a couple of weeks. They did say that he could return to work. I think it was approximately 15 days after, but that wasn't the end of the analysis as far as his disability was concerned. He was still following up with his primary care physician. He was instructed to see a psychiatrist, which he couldn't afford because he lost his health insurance and his job. He was put back on an increased dose of Lexapro, and at the time of his deposition he was still taking the medication. Thank you. Thank you. Thank you both for your argument. The case will be submitted.